May it please the Court, this case involves six transfers from Stanford Coins & Bullion, or SCB, to Dillon Gage beginning on January 23, 2009 and ending at the inception of the receivership the next month. The receiver challenged only those transfers for a very good reason, and that is that unlike in the typical fraudulent transfer case, in this case the payments from that date forward involve direct and conclusive evidence of both of the two critical issues that make up this appeal under the Texas Uniform Fraudulent Transfer Act. First, that the challenged transfers were made with actual intent to hinder, delay, or defraud, and second, that Dillon Gage cannot establish its affirmative defense that it took any of the transfers in good faith. And those two things together mean that all the transfers are voidable. The uncontroverted evidence at trial that justifies rendition by this Court by simultaneously proving the receiver's case and disproving Dillon Gage's good faith affirmative defense is encapsulated in Plaintiff's Exhibit 160. The transcript of a phone call that's discussed greatly in the briefs between SCB and Dillon Gage. That phone call was so significant that the receiver did not challenge any of the prior transfers but only those that happened after that call. And so starting with intent and looking at that particularly important evidence, intent is not the desire to cause harm. Intent is understanding the effects, the natural consequences of one's actions. And if you look at Plaintiff's Exhibit 160, which starts at page 29, 677 of the record, we see Terry Hanlon, Dillon Gage's president, placing the call because SCB owed Dillon Gage over $2.3 million. It had blown past its credit limit. It was four months past due on many of these bills in an industry that were three, six, nine-day turnarounds typically. Hanlon was very worried and he made it very clear. And in response, Scott Terry, SCB's vice president of operations, didn't say, what in the world are you calling for? He said, I understand your concern. And he provided a plan in order to make Dillon Gage whole. And that plan was to make a fraudulent transfer, the substantial certainty of hindering, delaying and defrauding the creditors being the basis of that. And here's what he said. First, SCB's reassurance just two days earlier to Hanlon from SCB that there was no problem was false. SCB secondly said it doesn't have enough money to pay Dillon Gage. Third, it said, we have previously paid our bills, gotten the money to be able to do this by taking loans and capital from Stanford, Stanford International Bank, Stanford Group Company, and told Dillon Gage that line of credit, that access to capital has been cut off. This is the story that you gave also at closing argument, powerfully, that what they were doing was robbing Peter to pay Paul. That exact line was one of the things that was stated by Dillon Gage in this case, in that call. But therefore, the jury heard it. And the jury also heard Frizard, is that his name? Yeah. And Terry say it was all on an upswing. We had a lot of, you know, accounts receivable. We had inventory, but for being shut down. So they had that choice, and they chose to believe that they still thought they would be able to pay the gallery back. Your Honor, the reason that that verdict can't stand is twofold in response to what you just said. First of all, there isn't a substantial conflict in the evidence because everything that is actually in the record and is agreed to and substantiated points in a single direction that for its entire history up until that very point, Dillon Gage, SCB, had never once been profitable. But then in your closings, you said, you know, don't credit Terry and Frizard because it's, quote, rosiness. But the jury — Frizard and Hamlin both together, and Terry, exactly. It's all rosiness. But then they — You're not saying that the jury couldn't have, right? They specifically said our revenues had gone from $39 million to $60 million. And so there's testimony for the jury to decide they weren't going to just keep robbing Peter to pay Paul. They actually had a business model. Well, the first thing is that business model, even in that year with $60 million, was a five — that was their best year, $500,000 deficit. And so it's only speculation, which does not rise to the level of evidence that can sustain a jury verdict. But secondly — Slow down. It's only speculation — That they would ever be able to turn a profit. When would we — when would we on appeal characterize two witnesses' testimony as speculation, one that a jury couldn't credit? Give us a — give me a case that allows us to do that. Well, I think that all of the cases that talk about evidence being a scintilla — this is a scintilla, Your Honor, because it was simply a post-talk litigation moment of saying we think things were going to turn around, but the actual evidence of the condition at the time that it was made and confirmed at trial was that SCB never had — it had no prospects. This was a $3 million deal that it made $26,000 on. It would require 115 of those deals in order just to be able to pay back the gallery to get its money. But let me turn to the second point, Your Honor. Yeah. Legal error, right? And that is that the jury, even understanding everything that we said, had been misinstructed because the definition of intent, the legal definition of intent, was denied. And so when you look at Tufta, and, you know, most lawyers, let alone laymen, are not going to read the Uniform Fraudulent Transfer Act and readily understand every little nuance on it. And actual intent is, in particular, a term of art that we know means the natural consequences of an action. What Tufta case do you have that is — that sort of rescinds our normal pattern instruction that knowledge and intent are used in their common meaning and, therefore, do not require further instruction? What Tufta case requires elaboration when generally intent doesn't require further elaboration? Well, I don't know that it's ever been in a Tufta case, but the — Tufta does say in Section 24.012, adding the uniformity provision, this should be understood — this statute should be understood in light of the comments to the Uniform Law Commissioner's promulgation of the Uniform Fraudulent Transfer Act. I guess I'm just wondering, is there a legal error in not giving it? It looked like you were still free to argue this was what you argued. You got the badges of fraud instruction, so you could say they're in dismal, dismal shape. It's all baloney. They can't pay. Well — So how did it, one, prejudice you, and what's the case that says it's legal error not to elaborate as to what intent means? Well, I would say Sentinel-1, which is described in there, although that's coming from the Seventh Circuit. It was thought about twice by two panels, and it made very clear that actual intent cannot mean anything that its normal colloquial usage would suggest, which is to say actual intent to harm the gallery, for instance. Of course SCB had no such intent. Yeah. But Sentinel-1, and I know this is your factual proposition here, too, but that was a case where you — they could never have paid back. And you're saying that's exactly like what happened here. Well, it's not essential to say that they could not have paid back the gallery. The only way they could do that was by doing the same thing that they had done. You know, delay is sufficient, and it's very clear. There was a call two weeks beforehand saying, you know what, you're still $2 million behind. They had no options for being able to do that.  But you're not saying Sentinel-1 stands for the proposition that a solvent company has to segregate accounts. It's perfectly fine for a company that's solvent to have one business account, so necessarily the money from the gallery could easily pay antecedent debts owed to other creditors. That's not a fraud. The only fraud is if you put the money, commingle, pay antecedent debts, and you know in your head you're going to defraud or hinder the first creditor. And that was the point that was argued factually, and the jury said you lost. Well, and it's direct evidence from the statement. The jury was instructed about actual intent without understanding this. Our argument cannot replace the judge, and there are a number of cases. And you can look at page 25, notes 7 and 8 of our opening brief, which go through a number of cases, which make — It always helps me when a lawyer says a number of cases. Give me your best one. I think Sentinel-1 is the best case. I honestly think that that case establishes the proposition that when you have subjected a creditor to a risk with which is unaware, segregate — Didn't that case require legal segregation of accounts? That was not important at all to the UFCA point. Did it? Yes or no? Well, the Commodities Exchange Act did require it. That is correct. But here's why that's significant and helpful, I think, in this case, to understanding it is the reason that those particular creditors in Sentinel-1 could say we had no expectation of being subjected to this risk, that our money would be used for Sentinel's — a collateral for Sentinel's own trades is because we're protected by this law. That, the Court said, makes it especially egregious, but it was not an essential part of finding that it was actual intent. Similarly here, there's uniformly — there's one thing that all witnesses agreed to in this case. It was that the gallery and each of the witnesses themselves and any reasonable person would not have transferred that money if they had known that it would be immediately short-circuited, passed through the same day to Dillon Gage, and that's what the transcript says. This is our plan. We have this crazy deal — that's the phrase that was used — $3 million, which we will use to make you whole. In other words, we are subjecting the gallery to a risk of which it has no expectation, and we know that the gallery, the transcript of the call between Hanlon and Melissa Lazaroff, she said, oh, my God, oh, my God, they're using my money to pay Joe Frisard's old debts? Oh, my God, I am — and then a word I won't say in court. And the point of that is that whether it's from the Commodities Exchange Act or from reasonable commercial practice, there is no case that has been cited that says that actual intent only means the desire that the gallery would be harmed. Of course SCB hoped that some miracle would happen. Another 115 crazy deals. You can't do preferential payments to a — to a different creditor who has an antecedent debt. GE Capital under Tufta specifically says that case resolves that question. Well, that was a good-faith case. Well, it was also a preference case. Part IVa of that opinion, I think, Your Honor, deals with this question alleged exactly the same way. We're just preferring to pay Worthington instead of GE Capital. It was exactly the same thing. GE Capital transferred the money in for a fraudulent purpose. That was immediately transferred to pay the preexisting debt of the creditor. Just as here, Dillon Gage was paid because the gallery transferred money that was supposed to be buying gold for it, and instead SCB bought time for itself. And that is the one thing that a preference is not, and that is the one thing this Court has said. Whatever a preference might be, one's own assets. If you made a float, that's fraudulent. It's — it's — and again, the segregation point and playing the float point is only a big problem if you know that you don't have anything else in this pool to pay. That's true, but why isn't that just a fact question? I mean, you've made a powerful argument. The closing argument is pretty compelling, too. But the jury chose to maybe credit the Pollyanna view that Terry and Frisard had. Pollyanna views aren't things that juries can — can credit. But even if — I think it's important to make clear. The jury here, I think, was doing the job the best that it could and laboring under the instructions without understanding of what intent meant as a legal matter, without understanding this preference instruction, which is to say that must be in there for a reason. It was supposedly in there to correct the receiver's testimony. The receiver's testimony was entirely correct about what a fraudulent transfer was. There was nothing too correct. The judge himself said, I would not normally give this instruction. Why? Because it only can mislead and confuse. And at that exact moment, there was an objection, and the judge told the jury, I'll explain the law. So this overcorrection actually caused the jury to say, well, there must be a mere preference in here somewhere, but there is no evidence in this record, any more than if you're at an ATM machine and you — Sotomayor, is the preference instruction wrong as a matter of law, or you just say it could have led to the impression that all preferences are okay? Well, I think two things. It leads to that impression, but more importantly, it leads to the misimpression on the part of the jury that it somehow has something to do with this case. But is it a correct statement of law? In isolation, it is. And I think that a correct statement of law is the bare minimum which we can expect in instructions. Hopefully, they do more and they actually guide the jury. I think the judge's statement that he would ordinarily never give that instruction is quite telling. And he shouldn't give it in a case like this, because it can only mislead. There was no more preference in this case. Oh, I owe something to the gallery, I owe something to Dill & Gage, I'll pay Dill & Gage with what I have, than there would be, as I say, if you're at the ATM and somebody with a gun at your head says, would you prefer to give me that money or to have your head blown off? That wouldn't be a mere preference, and nothing in this record suggests that it was a mere preference for two reasons. First, we know that it was, as in GE Capital, the creation of a new creditor, the gallery, in order to pay off the existing creditor. That's not like two preexisting creditors, the music has stopped and I say, I'll pay this guy instead of that guy. It was a plan that was described, still in the works. It hadn't yet happened. And in P.X. 160, you see the principals talking about what they're going to do with the gallery's money. And that is why that call is so important. It simultaneously establishes both actual intent and bad faith. This is not one of those where we have, as in most Tufta or UFTA cases, to use circumstantial evidence. The badges of fraud instruction was also misleading, but the badges of fraud are just circumstantial icing on the cake. You look at cases like Ritchie Capital from the Eighth Circuit, which says multiple times in the opinion, it is a rare day in which we have direct evidence of any of these things, and that's why, since the Best Records site that other creditors were not being paid due. Is it to your expert, or is there a specific document or anything to show this wasn't just a single creditor not being paid? Well, I think it is the expert is the best, and it's unrebutted. There are two things I'd say. First, the amount of trade creditor debt growing, more than doubling in the first six weeks of 2009, aside from the gallery, is a pretty good indication of that. But secondly, there was no need to identify by name. The Dillon Gage was the creditor, the supplier, and without it, SEB is out of business. And that transcript says that exact thing. If you don't pay us, don't think you can go to somebody else, because this is a small industry, you have two positions open, you're going to have to start telling your customers why you're not answering their orders. I reserved my time, Your Honor. You did? All right. Mr. Leventer. Thank you, Your Honor. May it please the Court. Jeff Leventer for Dillon Gage. I think much of what you've heard today from the receiver is jury argument, and it's jury argument that the jury was entitled to reject and did reject, because the receiver's evidence was far from conclusive. In fact, if anything, I would submit to you that the receiver's evidence was insufficient to establish that any of the six transfers was a fraudulent transfer. Their case really faces, I think, two obstacles, and that's before we even look at the sufficiency of the evidence supporting the jury's verdict. The first, of course, is from this Court's deferential standard of review to jury verdicts. The review is especially deferential. And secondly, on their best day, they only have two badges of fraud. Claims like that fail as a matter of law. They don't succeed as a matter of law. And with respect to the jury instructions, I don't think their argument fares any better. The Court's instructions tracked Texas law, tracked Tufta, and their claims of harm are nothing more than just speculation. There's no indication that any of those instructions that track Texas law affect the outcome. I want to talk about the insufficiency of the evidence of actual intent. There's no direct evidence that SCB had an actual intent to hinder, delay, or defraud any creditor. There were two officers of SCB who testified here, Mr. — Well, the phone call where they don't acknowledge to Gallery that the $3 million they're asking for seems to go a fair bit. In other words, I guess let me ask — phrase that as a question. Would you disagree that a jury could have found intent to hinder here based on the fact that they had no profit and the fact that they're diverting the Gallery money to Gage? A jury could have found that, but they didn't. Well, if I were in their shoes arguing as the appellant, I might have somewhat of a difficult road to hoe, but I don't think so, because I think their evidence was even insufficient, particularly as to the five transfers, other than the $3 million transfers in the charge A, B, C, D, and E. There's no evidence that any of those were fraudulent transfers. Those payments were made to Dill and Gage to pay it for shipments that it had previously made, and there's no evidence that any of those hindered anybody. In fact, the only — If the evidence showed that they knew they wouldn't be able to pay back Gallery, and so they paid Gage instead as their biggest client, then that's Sentinel-1, right? Well, this case is a far cry from Sentinel-1. I know, but just the legal proposition in Sentinel-1 is accurate. Well, Sentinel-1 deals with an investment manager who had a legal duty under the Commodities Exchange Act and under the customer agreement to segregate the customer money. True. Those are factual distinctions. But I guess I'm trying to get at do you agree with me that if the jury had been shown with a substantial certainty that SCB thought they would never be able to pay back without getting new customers, sort of a Ponzi scheme, that would be direct evidence of fraud? Possibly, except there was no such evidence. And, in fact, the two people from SCB who testified, Mr. Terry and Mr. Fasard, said we had every intention of paying every creditor, including Dill and Gage, the Gallery, and every other customer we had. So that testimony alone means you win. Is that your basic position? Well, yes, but we've got a lot more than that, too. I should talk about really how the $3 million transaction really went down. Well, you can, and I'd love you to, but maybe get to the intent instruction, because the intent instruction, if that's erroneous, that would have caused this whole — if that didn't properly describe the Sentinel-1 theory telling the jury that if these people had a substantial certainty that they were never going to pay Gallery-1 back, then that is — so here's the — I have a problem this way. I say things and then I have to phrase them as a question. The question is, is there anything wrong with the proposed instruction, legally wrong, with their substantial certainty language in the intent instruction they proposed that wasn't given? Well, for one thing, it doesn't come from any Tufti case. They draw it from Sentinel, which is a 548 case. Okay. But would you dispute — would you dispute — well, this was complicated in the record. Is the charge conference recorded anywhere? Yes. Well, there was an informal charge conference, but the formal charge conference is on the record. It is, but I didn't see any give and take about that proposed instruction, because it looks like everything went off the record. What the judge said is, he said you've asked for this additional language. I'm not going to give it to you, because I think what I'm giving to you is absolutely accurate. It tracks Tufti, and indeed his instruction was taken verbatim from Tufti. And most importantly, it's — So what's the record site for the judge saying, no, I'm not going to give it to you, because the instruction I'm giving tracks exactly Tufti? It was the last day of trial, Your Honor. Oh, the last — okay. Yes. Volume 5, I think. I can't give you the exact — Okay. No, I'm sorry. It was Volume 4. So he didn't say there's anything wrong with their instruction. He just said his instruction is sufficient.  He said my instruction is sufficient. It tracks Texas law. And he says it gives you leeway. In fact, what it says is in determining actual intent, consideration may be given, among other factors, to the following. And the among other factors gave them all the leeway they needed to argue their substantial certainty theories, and which they did. They argued it in spades. The problem was there was ample evidence cutting against their theory, because there wasn't substantial certainty that the gallery wouldn't get its inventory. The fact of the matter is, as of the day of the receivership, they only needed $1.9 million to make the order. The gold was sitting there. We had bought the gold. A hundred bars were sitting there. We'd already shipped one. On the day of the receivership, February 17th, they had $1.6 million. They only needed another one — they only needed a total of $1.9. There were three more weeks to go, importantly, before that order was even due. They gloss over the fact that the gallery's order wasn't even due to be shipped until March 4th. That gave a three-week window — actually, about two weeks from the time of the receivership — to come up with the remaining money, which they had every intention of doing and were able to do, because the evidence establishes that in this business, most of your money comes in the last week of a month. What's your best Hofda case where intent is just minimally described? It doesn't include the extra substantial certainty language? In other words, if you say that's all Tufter requires, you did exactly — what's the case that asserts that maybe it's never been — To my knowledge, it's never been dealt with. I guess what I would cite to you is the pre-war case, the companion case that was decided by this Court, where the same judge, Judge Godbee, in defining third-party beneficiary, simply tracked Texas law. And this Court held that that, in and of itself, makes for a correct instruction. And here, he did one step better. He simply quoted verbatim from the Tufta statute itself, which allowed them the flexibility through this other-factor language to argue the theory that they did. The jury just didn't buy it, and rightly so, because, as I say, there was $1.6 million sitting there, and the testimony of the only — really, the only two disinterested witnesses in this case for Zard and Terry was, but for the receiver coming in and shutting us down improperly, we had every intention of and would have paid the money to Dillon Gage to release those gold bars. I thought, in closing argument, you responded to theirs by saying, oh, wait for the jury instruction. You're going to hear the judge said that preferential payments are fine. Well, here's what happened on that. Mr. Janvey was the first witness to take the stand. He said, I'm a lawyer. Established he was a lawyer, very knowledgeable. And he told the jury — the question to him was, what is a fraudulent intent? And he said, a fraudulent intent is when you prefer one creditor over another creditor, and that's fraudulent intent. We objected to that. Later, the judge said — and this is — he told you half of what Judge Goudbee said. Judge Goudbee said, ordinarily, I don't give instructions telling what something is not. But in this case, I need to do it because the receiver misstated the law. And he did misstate the law. The law in Texas is that it is not fraudulent intent to prefer one creditor over another. And that's what Judge Goudbee instructed. In fact, he actually went one better. He said a mere intent to prefer one creditor over another is not fraudulent intent, a mere intent. But it would be fraudulent if at the time that you preferred, you knew you couldn't pay the first back. That's the distinction sentinel. You don't — Sure. Of course. So then we fall back. And they had every ability to argue that, did argue that, and they weren't impacted at all by that absolutely correct preference instruction that, again, simply tracked Texas law, the Alexander case, the Quinn case, and the Adams case. Alexander — what are the cases? Alexander was a federal district court case decided by Judge Means, but he had that exact language. And he quoted from two Texas Supreme Court cases, Quinn and Adams. So that's where that language comes from. And I think it's rather telling that the gallery, pre-war, in its own case, denied that any fraud had been committed against it. The bottom line is that the evidence is legally sufficient to support the jury's findings that not a one of the transfers was a fraudulent transfer. That's really the bottom line.  Well, I don't want to overstate the standing argument of Judge Higginson, but it's really sort of their — it's the way they frame their case. Their case morphed from what looked like a typical fraudulent transfer case into really sort of a common law fraud case where they were contending that the gallery had been defrauded. And they're still actually asserting that. If you look at their reply brief, the yellow brief pages, I think, 21 and 22, they're still trying to establish the elements of common law fraud. And we say, look, if that's your theory, that the gallery was defrauded, you don't have the standing to assert that claim. And we're absolutely right about that. They have standing to assert SCB's estate claim. The receivership entities is what they would have standing to assert. It's hard to see, actually, how any of the receivership entities were injured because they admit that SCB got reasonably equivalent value for all the bullion that we shipped either to SCB or to SCB's customers. It's hard to see how any upstream Ponzi company was defrauded. So I don't want to overstate the standing theory, but it is a problem, given the way they're now pitching their case and given the way it sort of morphed during the trial. I want to talk about insolvency for a moment. The evidence, again, was insufficient to establish insolvency, which was only their two badges of fraud. The receiver never even tried to prove balance sheet insolvency. He never tried to put at fair value either the assets or the liabilities. Instead, he tried to rely on equitable insolvency, that SCB generally was not paying its debts as they became due. That's the statutory test. But, again, the evidence is not conclusive. In fact, I would submit that it wasn't even sufficient. You had, again, the two SCB witnesses. Both of them said that SCB was generally paying its debts as they became due. They said, yeah, we were behind to Dillon Gage, no question about that. We were often behind to Dillon Gage, but we were catching up. And that actually disproves, I think, the receiver's claim. In fact, the receiver, two months before the trial, in a deposition, and this came in after the trial, admitted that he didn't know of any debts that SCB had. Their expert, Ms. Van Tassel, wasn't much better. She didn't analyze any of the factors that either the UFTA comments or the case law requires for determination of whether a debtor is generally not paying its debts as they become due. First of all, she couldn't identify any bills that were due and unpaid. She couldn't identify the number of unpaid debts. She couldn't identify or didn't identify the age of any unpaid debts. She didn't identify the proportion of debts that weren't being paid. And she didn't take into account any of SCB's payment practices. And I would point to the Court Judge Rosenthal's opinion, or actually opinions, in the Williams cases, Williams v. Houston, Plants and Garden, where the trustee there moved for summary judgment, saying I proved equitable insolvency is a matter of law. And Judge Rosenthal said, no, you didn't, because you didn't address any of these factors, the age, the aging, the number of debts, the amount of debts, and so on and so forth. I submit to you that Van Tassel's proof was even worse than the trustee in the Williams case. And Judge Rosenthal, I think, rightly said, I'm not going to find equitable insolvency as a matter of law. So, too, here, you cannot find equitable insolvency as a matter of law. Where would we look in the record to find that they were ever current on debts to Gage? Just to Gage, Van Tassel seems pretty much uncontroverted as to that. Gage may have been a slow collector. Right, right. I think the point was Mr. Fritz, our general manager, he said SCB was always slow, it was always late, but they always paid. And I think that kind of encapsulated what was happening here. They were always slow, and they were always late, but they always paid. And that's the antithesis of trying to say that, you know, you had a debtor not generally paying its debts as they became due. The problem with Van Tassel's testimony is she said debts are due when they're incurred. That's how she tried to avoid all the factors by saying debts are due when they're incurred. Well, debts aren't due when they're incurred. Debts are due when the parties agree when they're due. And that's a legal error. And I think it's a legal error that makes her testimony insufficient, legally insufficient to try to prove equitable insolvency. Just curious, why were the debts always delayed until the end of the month, the payment of the debts? Well, actually, SCB paid us every Friday. Now, they did get behind. At the end of the week, not the end of the month. Correct, end of the week, right, right. I think the end of the month was testimony from our expert, Mr. Fulgens, who said that in this business, he was a retailer as well, he said a lot of the money comes in the last week of the month. But as far as payments from SCB to Dillon Gage, they were made typically on Fridays. And, in fact, of the five payments, other than the $3 million payment, I think four of those came in on a Friday. In this sort of rarefied area of law, why wouldn't it be very helpful for a jury to know that if there's a substantial certainty that they will only be able to pay back the first creditor by constantly taking money from new creditors, then that's fraudulent? Would that be wrong legally, or that was implicit in the instruction and argued? I think the instruction from Judge Godbee gave them all the leeway they needed and deserved, actually, to make that argument. I say deserved because I think there was ample evidence to the contrary, that SCB's intention was to make sure that every single customer that it had got paid. And, indeed, and this is very important. Did they just have one business account? Did all monies in go into one and they paid all debts out of that? I think there was one general operating account. And, importantly, when they paid the— Would your opposing counsel's rule make that itself just a fraudulent predicament? Well, I don't think so because when the money came to us, to Dillon Gage, we applied $1.9 million to ship 70-some orders, thus helping them fulfill obligations, not hinder or defraud anybody. I mean, had we not done that, there would have been 74 creditors sitting out there, however many people had those orders. So, actually, we helped them fulfill orders. And, indeed, we would have helped them, as we sat with 100 gold bars, to fulfill the gold order as well. So the Galleries recourse is the third-party beneficiary case that you argued and we've already resolved. We've won that one. That's right. And we gave—there was a $1 million credit balance that we had as a result of this whole transaction. We actually tended it back. It's sitting in escrow. And they, nonetheless, were part of their damages here, included that million, but we don't have the million anymore. It went back. It's sitting there, and now they're entitled to it, to apply it, I guess, to the estate because we've now won the pre-war case. It's over. I don't think the Court needs to get into good faith. The jury didn't reach it, and I don't think this Court needs to do so either. I would simply say that the cases say that good faith is inherently a fact issue. In this case, there's no exception. There's ample evidence to establish that Dilligage had acted in good faith. No matter how you define good faith, they make an argument about how you define it. I say it doesn't matter. There's ample evidence that we neither knew nor should have known a bunch of the things they claim we should have known, so I won't talk about that further. I would, though, like to talk about our cross-appeal with respect to attorney's fees because I think this is the one area where Judge Godbee erred. He erred by applying a more demanding standard to Dilligage as the prevailing defendant than he's applied to the receiver when the receiver is a prevailing plaintiff. He made it show that the receiver's claims were frivolous, unreasonable, and without merit, a very difficult standard to meet. That was really the sole test that he applied. There's no basis, though, in Tufta or the mirror statute in Texas, the Declaratory Judgment Act, to imposing that kind of burden and treating prevailing plaintiffs a lot better than prevailing defendants. There's just no basis for that. Instead, what the court should have done was to look at the totality of the circumstances, including the objective reasonableness of the receiver's claims. And I draw support from two Copyright Act cases in the U.S. Supreme Court to be sure the language of the Copyright Act is somewhat different, but it's the Fogarty case and the more recent Kirksong case, which talks about looking at the totality of the circumstances and not controlling a definitive weight on what I would call the Christiansburg garment test, which is inapplicable in this context. Now, this standard that I'm urging, the totality, it won't shill the receiver from bringing meritorious claims, and the district court didn't say that it would. What it will do is deter the receiver from spending the estate's money, which he has, on bringing claims that were, I would say, overaggressive and unnecessary and intensely litigated, only to then be abandoned on the eve of trial. And that's what we have here. He was bringing Ponzi presumption claims. He was claiming a presumption of insolvency, claiming a presumption of fraudulent intent. He was claiming SCD was part of the Ponzi scheme. He was claiming constructive fraudulent transfer. He backed off every one of those at trial, and yet we were forced to spend money defending against those, and it's only those fees that we seek to recover. We're not seeking to recover any of the fees defending against the claim that did go to trial. We're only trying to get a much smaller portion of those fees incurred defending against what I would submit were unnecessary and overaggressive and, well, I guess that's it. They were overaggressive and unnecessary, only to then be abandoned. And those are the fees that we seek to recover under a proper legal standard, and we want the opportunity to obtain those fees or at least have the case sent to Judge Godbee to be considered under the correct standard. So unless the Court has any questions, that will conclude my argument. All right. Thank you, sir. Mr. Young. Thank you, Your Honor. Let me just start with one important point that's overarching for this case, and that is that no one's arguing that Dillon Gage should be poured out. This is a question about whether or not Dillon Gage should be part of the processing of claims. It gave the gold for sure. It would be entitled to that and, indeed, has a contingent claim with the receivership. The question is whether or not one creditor, with its insider knowledge and its pressure tactics, will be able to extricate itself from that process and take 100 percent and leave others who didn't have that kind of knowledge or didn't exercise that kind of pressure to the claims process of the receivership. I would talk a little bit about intent. You know, we talked about the instruction here. And, you know, our briefs cite several cases, both of them do. You know, one of them is from the Federal Circuit, the structural rubber products case in which the word obviousness was at issue. And that has a colloquial meaning. And the Court said, look, it's a term that's overladen with layman's meaning. And it would be error not to give an instruction about its legal connotation because it's so different. It can only add confusion. And our point about intent here is exactly the same. Actual intent is something that no one would say, I don't know what that means. And precisely because actual intent, there are no cases that say that actual intent means what we ordinarily would say that it means. That instruction started off the jury on the entirely wrong path. And so at the very least, you take that, you take the mistaken preference instruction, you add that to the unwillingness to explain that the badges of fraud are only additional circumstantial evidence that the receiver didn't need, much less the counting up of them as some Federal district courts have done. The Branson case from the Seventh Circuit said that has a mesmerizing effect. And, indeed, the judge in that case said, well, there are five badges that were found here, 11 on the list, that's not enough, so I guess they haven't been able to establish it. And that clearly was wrong, the Seventh Circuit said. And you take those three in particular together, and the jury cannot possibly have been proceeding in this case by examining the evidence in its rightful way or by The intention to pay back the gallery, to buy the gold for the gallery, there is no dispute that SCB had such a desire, no question about that. But that simply relies on a mistaken understanding, again, of what intent was. The fact that we're having that argument, and that's a big part of the briefing, only illustrates why that instruction must have been wrong. If we have the counsel in this case unable to recognize what every court that's question has said, clearly the jury would fall back to its understanding colloquial of what intent meant. Bad faith is, indeed, often a factual question. But several cases make very clear, including from this Court, that bad faith can be decided as a matter of law. And the most recent Court, I suppose, to discuss that would have been Sentinel 2. On remand, the district court made another error, and the court of appeals again said, well, the problem was that we shouldn't have even sent it back. This was established as a matter of law. Your Honor, I think that, you know, in concluding the receiver's case, we would say, first of all, that this is the rare case in which that direct evidence has to have been conclusive. At the very least, because of the jury's confusion, the receiver should have an opportunity to persuade the jury, which we think the jury comes out with any notion of. Roberts. There was one question. I honestly can't remember what it was right now, Your Honor. But it wasn't on the intent question. I don't think that it was. And if I'm mistaken on that, I apologize. But what's clear is that a jury looking at these instructions would probably not have thought it needed to ask too many questions, because any of us instructed to find whether or not there was actual intent to harm the gallery or other creditors would say there's unopposed testimony that there was no such intent. The problem is that that only could mislead the jury in finding the legal question is actually at issue. And so, accordingly, at the very least, the jury should have the opportunity to understand, using the proper framework, what the jury is saying. Alito. Is that much more technical than a willful blindness theory? Tell me if I'm wrong, but you don't have to get the instruction to be able to argue it. Roberts. Well, I think here what we have is a set of instructions that affirmably dissuade the jury. All three of your points of error together. All of those together. And the fourth one is about the Stanford Ponzi scheme transfers, which certainly had the effect of telling the jury that it could regard SCB as having even more assets that clearly were not proper for it to have. And so with all of those things, we would ask for the Court to render judgment for the receiver or at least give us a chance to make our case using proper law. Thank you, Your Honor. All right. Thank you, Mr. Young. Thank you, Your Honor.